SCOTT A. THOMPSON
TAMI S. STARK (TS-8321)
Attorneys for Plaintiff
SECURITIES AND EXCHANGE COMMISSION
701 Market Street
Suite 2000
Philadelphia, PA  19106
Telephone: (215) 597-3100
Telefax: (215) 597-2740

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

_____
                                                    :
SECURITIES AND EXCHANGE COMMISSION,                 :
                                                    :
                        Plaintiff,                  :
                                                    :
                v.                                  :    Civ No. 08CV0415 (LBS)
                                                    :    ECF Case
ANATOLY RUSS,                                       :
                                                    :
                        Defendant.                  :
_____:

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF
SECURITIES AND EXCHANGE COMMISSION'S MOTION FOR
FINAL JUDGMENT ON DEFAULT AND ORDER OF PERMANENT
INJUNCTION AND OTHER RELIEF AGAINST DEFENDANT
ANATOLY RUSS AND AN ORDER FREEZING
<u>ASSETS AND DIRECTING PAYMENT TO THE COURT</u>**

Plaintiff Securities and Exchange Commission (the "Commission") respectfully

submits this Memorandum of Law in support of its motion, pursuant to Rule 55(b)(2) of

the Federal Rules of Civil Procedure, for the entry of a default judgment, permanent

injunction, and other relief against defendant Anatoly Russ, and for an Order freezing

Russ' assets currently held by U.S. based broker-dealers and exercising jurisdiction over

those assets.

Between August 23, 2006, and September 19, 2006, Russ engaged in a fraudulent scheme to control the prices at which he purchased and sold options on a thinly traded bond Exchange Traded Fund ("ETF") by intruding into innocent third parties' online trading accounts and placing unauthorized orders designed to match orders in his own accounts – at prices he determined.  This fraudulent behavior allowed Russ to reap $88,465 in unlawful profits while causing losses of $339,929 in the intruded online accounts – which was absorbed by the account holders' online broker-dealers, who reimbursed their account holders.

On January 16, 2008, the Commission filed this action against Anatoly Russ, alleging violations of Section 17(a) of the Securities Act of 1933, 15 U.S.C. § 77q(a) ("Securities Act"), Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b) ("Exchange Act"), and Rule 10b-5, 17 C.F.R. § 240.10b-5, thereunder.  Because Russ is a resident of Russia, the Commission then moved for alternative means of service to be permitted.  The Court granted that motion, and Russ was served on February 20, 2008.

Russ has not responded to the Complaint, entered an appearance, attempted to contact the Commission, or otherwise acted to involve himself in this litigation.  The Clerk signed a Certificate Noting Default on May 28, 2008.  The Court should enter final judgment against Russ, because he is in default, and issue an Order imposing a permanent injunction and disgorgement, together with prejudgment interest, and a civil penalty, and enter an Order freezing Russ' ill-gotten gains currently held by U.S. broker-dealers and directing those funds to be paid into the Court.

## FACTS[1]

### I.    THE FRAUD

Anatoly Russ engaged in a complex fraudulent internet scheme by which he manipulated the prices at which he purchased and sold options on iShares Lehman Aggregate Bond Fund (AGG), a thinly traded ETF, by hacking into third parties' online brokerage accounts (the "intruded accounts") and placing unauthorized orders designed to match orders in his own online accounts.  In just over a three week period from August 23 through September 19, 2006, Russ used electronically stolen usernames and passwords to gain access to at least seven online brokerage accounts of unwitting third parties at E*Trade, Scottrade, and TD Ameritrade, while trading in four series of the thinly traded AGG option contracts.  Through this process, he was able to guarantee that his own accounts could "buy low," and "sell high," at prices many times higher than the market price, thus generating large profits for himself at the expense of the owners of the intruded accounts.

Apparently mindful of the possibility of detection, Russ went to great lengths to attempt to hide his activities.  For example, through various technological means, he masked his Internet Protocol ("IP") address when he logged into his online accounts and the intruded accounts.[2]

---

[1]    Except where attributed to other sources, these background facts are taken from the allegations in the Complaint.  Since defendant is in default, the allegations in the Complaint are uncontested and should be taken as true.  See Au Bon Pain Corp. v. Artect, Inc., 653 F.2d 61, 65 (2d Cir. 1981).

[2]    An IP address individually identifies a computer and can provide information about its geographic location.

At some point, some of Russ' brokers became suspicious of his trading patterns. Both TD Ameritrade, and Penson Financial Services, Inc., ("Penson") the clearing broker for NobleTrading.com, Inc., where Russ had an account, put "holds" on Russ' accounts before Russ was able to place further fraudulent trades or transfer additional ill-gotten gains to his Latvian bank.  See Declaration of Timothy L. Keninger (6/26/08) at ¶ 14, Exhibit A; Declaration of Ila Jehl at ¶ 6, Exhibit B.[3]  Penson currently holds $27,369.41 in a Russ account, and TD Ameritrade currently holds $2,375.86.  See Declaration of Kimberly Miller at ¶ 12, Exhibit C; Declaration of Timothy L. Keninger (6/26/08) at ¶ 17, Exhibit A.  These brokers have agreed to maintain a hold on these assets until further direction.  When these broker-dealers froze the accounts, Russ stopped using those accounts and began to trade through other accounts.

As a result of his fraudulent scheme, Russ realized at least $88,465 in unlawful profits and caused losses of $339,929 in the intruded online accounts.  As detailed in the attached affidavits, the online brokers have reimbursed their account holders for all losses related to Russ' unlawful scheme, bearing the losses themselves.  See Declaration of James Hassler at ¶ 12, Exhibit D; Declaration of James Autrey at ¶ 24, Exhibit E; Declaration of Timothy L. Keninger (9/18/07) at ¶ 24, Exhibit F.

## II.    THIS CIVIL ACTION

On January 16, 2008, the Commission filed this action against Anatoly Russ, alleging violations of Section 17(a) of the Securities Act, Section 10(b) of the Exchange Act, and Rule 10b-5, thereunder.  Shortly thereafter, the Commission attempted to provide notice of this litigation to Russ, who resides in Russia.

---

[3]    All exhibits are attached as exhibits to this memorandum of law.

The Commission sent a copy of the Complaint via email to the email account that Russ used to set up each of his online brokerage accounts through which he perpetrated the fraud, to send various emails to brokers to inquire as to the status of his accounts, and to follow up on his attempts to wire his ill-gotten gains to his Latvian bank account. <u>See</u> Declaration of Scott A. Thompson at ¶ 6, Exhibit G. Russ had requested to receive communications from at least some of his brokers at this same email address. <u>See</u> <u>id.</u>

The Commission also issued a "Litigation Release" on its website, http://www.sec.gov, identifying Russ by name, summarizing the Commission's allegations, and attaching a copy of the Complaint. This release was picked up by several online news sources, including at least two Russian news websites, kommersant.com, and themoscowtimes.com, as well as sources such as MSNBC, Business Week, and Yahoo, which published articles concerning the filing of the Complaint. <u>See</u> <u>id.</u> ¶¶ 4-5.[4] Therefore, Russ likely had notice of this lawsuit shortly after it was filed.

### A.    The Court Allowed Service by Alternative Means.

On February 4, 2008, the Commission filed an *ex parte* motion seeking an Order, pursuant to Federal Rule of Civil Procedure 4(f)(3), directing alternative means of service of the Summons and Complaint. In its motion, the Commission sought the ability to serve Russ through, alternatively, email, international courier (such as Federal Express), and international registered mail. In addition to Russ' email address, the Commission had acquired three mailing addresses that Russ provided to his online brokers, as well as a

---

[4]    <u>See also</u> http://www.kommersant.com/p-11944/Russ_SEC_fraud/ (Kommersant); http://www.themoscowtimes.com/stories/2008/01/18/061.html (Moscow Times); http://www.msnbc.msn.com/id/22689228/ (MSNBC); http://www.businessweek.com/ap/financialnews/D8U78KL80.htm (Business Week); http://biz.yahoo.com/ap/080116/sec_russian_trader.html?.v=1 (Yahoo).

mailing address he provided to the Latvian bank to which he wired the proceeds of his fraudulent trading.  See id. ¶ 9.  Two of the addresses are post office boxes in St. Petersburg, Russia, and two appear to be regular street addresses.  The most reliable address (other than the email address) appeared to be the mailing address Russ gave to the bank that housed Russ' illegal proceeds, as it is in the same small town listed on Russ' passport (Novaya Ladoga), located about 80 miles from St. Petersburg.  See id.  The Court granted the Commission's Motion on February 5, 2008, allowing the Commission 60 days to attempt to effect service by email, international courier, and international mail.

**B.    Russ Has Been Served.**

The Commission served Russ with copies of the Complaint, Summons, and the February 5 Order pursuant to the Court's Order.

- On February 7, 2008, the Commission sent the documents by Federal Express to the two known street addresses:

  | | |
  |---|---|
  | Anatoly Russ | Anatoly Russ |
  | Ul. Rabotnic, 15 | Okeansky Avenue House 101 App 134 |
  | 187453 Novaya Ladoga | Vladivostok 690002 |
  | Leningradskaya Oblast | Russia |
  | Russia | |

- On February 7, 2008, the Commission also sent the documents by international registered mail to the two known post office boxes:

  | | |
  |---|---|
  | Anatoly Russ | Anatoly Russ |
  | Glavpochtampt | Glavpochtampt |
  | Pochtoviy Yashik 357 | Pochtoviy Yashik 353 |
  | St. Petersburg 190000 | St. Petersburg 190000 |
  | Russia | Russia |

- On February 11, 2008, the Commission also sent an email to Russ, attaching the Summons and the Court's Order, and intending to attach a copy of the Complaint. However, due to a clerical error, the proper Complaint was not attached to the email.  The email did not bounce back.

- On February 20, 2008, upon discovering the prior clerical error, the Commission sent another email to Russ. That email properly attached the Complaint, Summons, and a copy of the Court's February 5, 2008 Order. The email also did not bounce back.

- On March 4, 2008, the packages sent by international registered mail were returned marked "Inconnu," meaning "unknown." The Commission has not been able to determine more information about why the packages were returned.

- On March 4, 2008, one of the Federal Express packages was returned as undeliverable, without further explanation.

- On March 14, 2008, the other Federal Express package was returned as undeliverable and designated as "incorrect address." The Commission has not been able to determine more information about why the Federal Express packages were returned.

See id. ¶¶ 12-16, Exhibit G.

Pursuant to the Court's Order, although the international courier and international registered mail packages were unable to be delivered, because the email did not bounce back, service was effective as of February 20, 2008. See February 5, 2008 Order. The Order states that:

> Service on Defendant Anatoly Russ, accomplished by these alternative means, shall be complete so long as:
>
> (1) the email service does not "bounce back"; or
>
> (2) either of the two international courier packages is delivered; or
>
> (3) either of the two international registered mail packages is delivered; AND upon filing of an affidavit of service, reflecting acknowledgement or other evidence establish that Russ received a copy of the Complaint and Summons.

Id.

On March 26, 2008, the Commission filed an Affidavit of Service with the Court describing this process. Interestingly, when the Commission attempted to serve a copy of that affidavit on Mr. Russ via email, the email bounced back. See Declaration of Scott A.

Thompson at ¶ 17, Exhibit G.  This indicates that sometime in the five weeks after he received the Complaint, Summons, and February 5, 2008 Order on February 20, Mr. Russ either abandoned that email account, or placed a filter on the email account to prevent the receipt of further Commission communications.  This is further evidence that he did, in fact, receive the Complaint and Summons.[5]

### C.    Russ is in Default.

Pursuant to Federal Rule of Civil Procedure 12, defendant Russ was required to respond to the Complaint within 90 days of Service (February 20, 2008).  Therefore, Russ was required to respond to the Complaint by May 20, 2008.  Russ did not do so.  On May 28, 2008, in response to a Commission request, the Clerk signed a Certificate Noting Default.  The Certificate Noting Default is attached as Exhibit I.

As of the date of this filing, defendant has made no effort to file any letter, pleading or other document in this matter.  Accordingly, the Commission now seeks an order (i) entering Final Judgment by default; (ii) permanently enjoining defendant from violating Section 17(a) of the Securities Act, 15 U.S.C. § 77q(a), Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5; (iii) ordering defendant Russ to disgorge $88,465 and pay $12,407.52 in prejudgment interest; and (iv) to pay a civil penalty in the amount of $130,000.  The Commission also seeks an Order freezing Russ' funds currently held by Penson Financial Services, Inc.

---

[5]    Upon learning that the email bounced back, the Commission once again reached out to the Latvian bank to which Russ had wired his ill-gotten gains to see if it had any new contact information for Russ.  See Declaration of Scott A. Thompson at ¶ 18, Exhibit G.  It did not.  See id.; see also April 30, 2008 letter from Janis Brazovskis, Exhibit H.  The Commission has also been advised that emails from one of the brokers had also begun to bounce back around the time it had decided to place restrictions on Russ' account, suggesting that Russ has been using filters for some time.  See Declaration of Scott A. Thompson at ¶ 7, Exhibit G.

and TD Ameritrade, Inc. and directing those broker-dealers to transfer those funds to the Court in partial satisfaction of the judgment, so they may be redistributed to the broker-dealers who absorbed the losses of the intruded account holders.

## **ARGUMENT**

### I.    **ENTRY OF A FINAL JUDGMENT BY DEFAULT AGAINST DEFENDANT RUSS IS APPROPRIATE.**

Where "a party fails to respond . . . the court is ordinarily justified in entering a judgment against the defaulting party." Bermudez v. Reid, 733 F.2d 18, 21 (2d Cir. 1984). The entry of a default judgment under Rule 55(b) of the Federal Rules of Civil Procedure is left to the "sound judicial discretion" of the court. See 10 Wright, Miller & Kane, Federal Practice & Procedure § 2685 (3d ed. 1998). Here, defendant was properly served with the Summons and Complaint, has not appeared in this action or made any attempts to contact the Commission, and has failed to respond in any way to the Complaint. The Clerk executed a Certificate Noting Default on May 28, 2008. See Exhibit I. Defendant should not be permitted to avoid the consequences of his fraudulent conduct by simply ignoring this lawsuit. Accordingly, judgment by default is appropriate.[6]

Upon a defendant's default, the Court should accept as true all of the factual allegations of the complaint. See Au Bon Pain Corp. v. Artect, Inc., 653 F.2d 61, 65 (2d Cir. 1981); Schwartz-Liebman Textiles v. Last Exit Corp., 815 F. Supp. 106, 107 (S.D.N.Y. 1992) (noting that default judgment entered on well-pleaded allegations of a

---

[6]    The defendant is not a minor, nor is he incompetent and, therefore, is not protected from entry of a default judgment. See Fed. R. Civ. P. 55(b).

complaint establishes a defendant's liability).  In failing to properly answer the

Complaint, Russ has conceded all of the Complaint's factual allegations as to liability.

## II.    THE FACTUAL ALLEGATIONS ESTABLISH VIOLATIONS OF THE FEDERAL SECURITIES LAWS.

Russ' conduct violates both the Securities Act and the Exchange Act.   Section

17(a) of the Securities Act prohibits any person, in the offer or sale of any securities,

from, directly or indirectly:  (1) employing any device, scheme or artifice to defraud; (2)

obtaining money or property by means of any untrue statement of material fact or any

omission to state a material fact necessary in order to make the statements made, in the

light of the circumstances under which they were made, not misleading; or (3) engaging

in any transaction, practice or course of business that operates or would operate as a fraud

or deceit upon the purchaser.  Section 10(b) of the Exchange Act and Rule 10b-5

thereunder prohibit essentially the same conduct made in connection with the purchase or

sale of any security.  See Savino v. E.F. Hutton & Co., 507 F. Supp. 1225, 1231

(S.D.N.Y. 1981) ("Since Section 17(a), like Section 10(b), sounds in fraud, similar

allegations are required to state a claim under that section.").  Section 10(b) provides that

"[i]t shall be unlawful for any person . . . [t]o use or employ, in connection with the

purchase or sale of any security . . . any manipulative or deceptive device or contrivance

in contravention of such rules and regulations as the Commission may prescribe . . ."  15

U.S.C. § 78j(b).  Pursuant to Section 10(b), the Commission promulgated Rule 10b-5(a)

and (c), which prohibit, respectively, "employ[ing] any device, scheme or artifice to

defraud" and "engag[ing] in any act, practice, or course of business which operates or

would operate as a fraud or deceit upon any person."  17 C.F.R. § 240.10b-5.

A claim under both of these statutes does not require "'the making of an untrue statement of material fact or omission to state a material fact,'" but may rely on proof of fraudulent conduct or a fraudulent scheme. Compudyne Corp. v. Shane, 453 F. Supp.2d 807, 821 (S.D.N.Y. 2006) (quoting In re Enron Corp. Secs., Derivative & ERISA Litig., 235 F. Supp.2d 549, 577 (S.D. Tex. 2002)); In re Global Crossing, Ltd. Sec. Litig., 322 F. Supp.2d 319, 335 (S.D.N.Y. 2004) ("It is apparent from Rule 10b-5's language and the caselaw interpreting it that a cause of action exists under subsections (a) and (c) for behavior that constitutes participation in a fraudulent scheme, even absent a fraudulent statement by the defendant."). Along with fraudulent or deceptive acts or misrepresentations, in order to be liable under Section 17(a) of the Securities Act or Section 10(b) of the Exchange Act, a defendant must engage in those acts in connection with the purchase or sale of securities, and must do so with scienter, i.e., an intent to defraud. See SEC v. Northshore Asset Mgmt., 05 cv 2192, 2008 U.S. Dist. Lexis 36160, at *20-*21 (S.D.N.Y. May 5, 2008) ("To establish a claim under either § 10(b) of the Exchange Act or § 17(a) of the Securities Act, a plaintiff must prove that the defendant, acting with scienter, made a material misrepresentation or omission (if the defendant had a duty to speak) or used a fraudulent device in connection with the offer, purchase, or sale of a security."). Here, there is little question that Russ' conduct meets these elements of both statutes.

### A.    Russ Engaged in a Fraudulent Scheme.

As set forth in the established facts of the Complaint, defendant's entire scheme was designed to deceptively gain unauthorized access to third party trading accounts and place buy or sell orders designed to match up with his own orders, so as to make grossly

one-sided trades at the expense of the unwitting third parties. In doing so, Russ hid his

own identity through various electronic means by masking his IP address and logging in

using the stolen usernames and passwords of his victims. While he was rather successful

at masking how he conducted the intrusions, there is no innocent explanation for the

pattern and timing of Russ' trades and how they coincide with the intruded upon

accounts. Russ' conduct was plainly a deceptive scheme.

It is of no moment that defendant's fraudulent conduct here involved the complex

and unauthorized deceptive hacking into third parties' trading accounts using stolen

usernames and passwords, and not a more typical misrepresentation or omission. The

United States Court of Appeals for the Second Circuit has stated that, "We believe that

§ 10(b) and Rule 10b-5 prohibit *all* fraudulent schemes in connection with the purchase

or sale of securities, whether the artifices employed involve a garden type variety of

fraud, or present a unique form of deception." A. T. Brod & Co. v. Perlow, 375 F.2d

393, 397 (2d Cir. 1967) (emphasis in original). Moreover, Russ also made false

statements and misrepresentations by identifying himself using the intruded account

holders' names during the login process.

### B.     Russ' Conduct Was "in Connection with" the Purchase or Sale of Securities.

For conduct to be reached under Section 17(a) or Section 10(b) and Rule 10b-5, a

defendant's conduct must also be connected to a securities transaction. "17(a) prohibits

fraudulent conduct in the offer or sale of any security, whereas Section 10(b) prohibits

fraud in connection with the purchase or sale of any security." Savino v. E. F. Hutton &

Co., 507 F. Supp. 1225, 1231 n.4 (S.D.N.Y. 1981); see, e.g., SEC v. Mandaci, No. 00-

Civ-6635, 2004 U.S. Dist. Lexis 19143, at *28-*29 (S.D.N.Y. 2004). Given the extent of

Russ' conduct here, which involved the direct purchase and sale of securities, there is no question that Russ' fraudulent conduct meets both standards.

In SEC v. Zandford, 535 U.S. 813, 822 (2002), the Supreme Court stated that the "in connection" requirement under Section 10(b) is met if the scheme to defraud and the sale of securities coincide. In the present case, the defendant's account intrusion scheme not only coincided with the purchase and sale of securities, the scheme was employed *solely* for the purpose of trading in securities.

**C.     Russ Acted with Scienter.**

As the Supreme Court has held, "the language of § 17(a) requires scienter under § 17(a)(1), but not under § 17(a)(2) or § 17(a)(3)." Aaron v. SEC, 446 U.S. 680, 697 (1980). Violations of Section 10(b) of the Exchange Act and Rule 10b-5 also require a showing of scienter. Id. Scienter is the "mental state embracing intent to deceive, manipulate or defraud." Ernst & Ernst v. Hochfelder, 425 U.S. 185, 193 (1976). The law does not require direct evidence of scienter, rather "proof of scienter is often a matter of inference from circumstantial evidence." Herman & MacLean v. Huddleston, 459 U.S. 375, 390-91 n.30 (1983). Given that Russ' conduct involved deliberate steps that were unquestionably illegal – such as hacking into other traders' accounts, liquidating their securities holdings without their knowledge or consent, and using their funds to make purchases and sales – Russ clearly acted with scienter.

While scienter may be established several different ways, this case lends itself to the most straightforward analysis and meets every standard. The inference of scienter exists where defendants "engaged in deliberately illegal behavior" or "benefited in a concrete and personal way from the purported fraud." Novak v. Kasaks, 216 F.3d 300,

311 (2d Cir. 2000). Scienter may also be established by facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness, or facts of the defendant's motive and opportunity to commit fraud. See ATSI Communs., Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 99 (2d Cir. 2007). Motive would entail receiving "concrete benefits" from the fraudulent conduct and opportunity would "entail the means and likely prospect of achieving concrete benefits by the means alleged." Novak, 216 F.3d at 307 (quoting Shields v. Citytrust Bancorp, Inc., 25 F.3d 1124, 1130 (2d Cir. 1994)). Scienter is easily proven here under any of the above tests.

The established facts of the Complaint demonstrate that Russ conducted a sophisticated fraudulent scheme, and did so intentionally. Russ deliberately intruded into the personal trading accounts of innocent third parties, and used their holdings and funds to make purchases and sales of the same thinly traded options that he had acquired so that he could trade his shares at a significant profit. Russ' conduct was deliberate, reckless, and intended to create "concrete benefits" for the defendant at the expense of the market and the victimized account holders.

There is no innocent explanation for the pattern and timing of Russ' trading, and the way in which those trades match up precisely to trades in intruded accounts. Russ' trades always won. The intruded accountholders always lost. The scheme was very profitable, and there were many innocent victims. Scienter is clearly established.

Russ violated Section 17(a), Section 10(b), and Rule 10b-5. He engaged in a complex, hi-tech scheme in which he used stolen usernames and passwords to gain unauthorized access to third parties' accounts and used those accounts to engage in trades with his own accounts at outrageous prices. This conduct, which was undertaken with

14

scienter, clearly constitutes a scheme to defraud, in connection with the purchase and sale of securities.

## III.    THE COURT SHOULD GRANT ALL OF THE RELIEF REQUESTED BY THE COMMISSION.

### A.    The Court Should Permanently Enjoin Defendant Russ.

The Court should permanently enjoin defendant from future violations of Section 17(a) of the Securities Act, Section 10(b) of the Exchange Act, and Rule 10b-5 thereunder. Section 20(d) of the Securities Act, and Section 21(d) of the Exchange Act entitle the Commission to obtain permanent injunctive relief upon a showing that:  (1) violations of the securities laws occurred; and (2) there is a reasonable likelihood that violations will occur in the future.[7]  See SEC v. Commonwealth Chem. Sec., Inc., 574 F.2d 90, 100 (2d Cir. 1978); SEC v. Manor Nursing Ctr., Inc., 458 F.2d 1082, 1100-01 (2d Cir. 1972); SEC v. Softpoint, Inc., 958 F. Supp. 846, 866 (S.D.N.Y. 1997), aff'd, 159 F.3d 1348 (2d Cir. 1998).  Permanent injunctions against future violations of the securities laws may be ordered as part of a judgment by default, if a factual basis for that relief exists to meet the above standard.  See SEC v. Management Dynamics, Inc., 515 F.2d 801, 814 (2d Cir. 1975).  That basis exists here.

*Violations of the Securities Laws*:  Here, the securities law violations alleged by the Commission are established as a matter of law because, on a default judgment motion, the well-pleaded allegations of the complaint are deemed admitted.  See Trans World

---

[7]    Unlike private litigants, the Commission need not show risk of irreparable injury, or the unavailability of remedies at law in a request for injunctive relief.  SEC v. Unifund SAL, 910 F.2d 1028, 1036 (2d Cir. 1990); SEC v. Management Dynamics, Inc., 515 F.2d 801, 808-09 (2d. Cir. 1975) (stating that standards of public interest, not requirements of private litigation, govern Commission requests for injunctive relief).

Airlines, Inc. v. Hughes, 449 F.2d 51, 63-64 (2d Cir. 1971), rev'd on other grounds, 409

U.S. 363 (1973); Comdyne I, Inc. v. Corbin, 908 F.2d 1142, 1149 (3d Cir. 1990). As

shown above, those allegations establish liability.

     ***Likelihood of Future Violations***: In considering whether there is a reasonable

likelihood that the defendant will commit future violations of the securities laws, the

Second Circuit weighs various factors including: (1) the egregiousness of the violation;

(2) the degree of scienter involved; (3) the isolated or repeated nature of the violations;

and (4) the defendant's recognition of the wrongful nature of the conduct. See SEC v.

Cavanagh, 155 F.3d 129, 135 (2d. Cir. 1998); SEC v. Softpoint, Inc., 958 F. Supp. 846,

867 (S.D.N.Y. 1997); Commonwealth Chem. Secs., Inc., 574 F.2d at 100-01. "In

particular, 'the commission of past illegal conduct is highly suggestive of the likelihood

of future violations.'" SEC v. Cavanagh, 98 CIV 1818, 2004 U.S. Dist. Lexis 13372, at

*92 (S.D.N.Y. July 16, 2004) (finding that defendants participation in "pump and dump"

scheme justified permanent injunctive relief sought by the Commission) (quoting SEC v.

Management Dynamics Inc., 515 F.2d 801, 807 (2d Cir. 1975)). These factors weigh

heavily towards injunctive relief against defendant here.

     Defendant's conduct was clearly egregious, deliberate, and highly deceptive.

And, defendant is sophisticated and tech-savy enough to have masked the precise

methods by which he perpetrated the fraud and then quickly wired the proceeds overseas.

As noted above, defendant undoubtedly acted with scienter. Finally, defendant engaged

in the same pattern of behavior regarding at least four series of AGG options contracts –

and there is little doubt that the unlawful activity would have continued had certain of the

online broker-dealers through which he was trading not detected unusual trading patterns

and taken steps to stop it.  There is every reason to believe that defendant will find a way to continue this scheme, or a similar scheme, in the future, if he has not already done so. In such circumstances, injunctive relief is warranted.

### B.    The Court Should Order Disgorgement and Prejudgment Interest.

Disgorgement is an equitable remedy for violations of the federal securities laws that "'is a method of forcing a defendant to give up the amount by which he is unjustly enriched.'"  SEC v. Tome, 833 F.2d 1086, 1096 (2d Cir. 1987) (quoting SEC v. Commonwealth Chem. Sec., Inc., 574 F.2d 90, 102 (2d Cir. 1978)).  Courts have recognized that it is a proper exercise of a court's equity powers to order disgorgement and prejudgment interest as remedies "[t]o prevent unjust enrichment and to deter others from violating the securities laws."  SEC v. Abacus Int'l Holding Corp., No. C 99-02191, 2001 U.S. Dist. Lexis 12635, at *12 (N.D. Cal. Aug. 16. 2001) (citing SEC v. Clark, 915 F.2d 439, 453 (9th Cir. 1990)).

Here, the Court should order defendant to disgorge the $88,465 in unlawful profits earned through this hi-tech scheme, along with prejudgment interest.[8]  Where, as here, an evidentiary record establishes the quantum of damages, the Court may enter default judgment without a hearing.  Fustok v. Conticommodity Servs., Inc., 873 F.2d 38, 40 (2d Cir. 1989).[9]

---

[8]    "Disgorgement need only be a reasonable approximation of profits causally connected to the violation. So long as the measure of disgorgement is reasonable, any risk of uncertainty should fall on the wrongdoer whose illegal conduct created the uncertainty."  SEC v. Warde, 151 F.3d 42, 50 (2d Cir. 1998).

[9]    Rule 55(b)(2) of the Federal Rules of Civil Procedure provides that, if the quantum of damages is not liquidated or susceptible to mathematical calculation, a court "may" conduct such hearings as are necessary "to determine the amount of damages."

The Court also should order defendant to pay prejudgment interest. Awarding prejudgment interest deprives defendant of the time value of his ill-gotten gains and is a proper exercise of judicial discretion in Commission cases. See SEC v. Warde, 151 F.3d 42, 50 (2d Cir. 1998); SEC v. Musella, 748 F. Supp. 1028, 1043 (S.D.N.Y. 1989), aff'd, 898 F.2d 138 (2d Cir. 1990). Requiring one who violates the federal securities laws to pay prejudgment interest "prevents a defendant from obtaining the benefit of 'what amounts to an interest free loan procured as a result of illegal activity.'" SEC v. Robinson, No. 00 Civ.7452 RMB AJP, 2002 U.S. Dist. Lexis 12811, at *9 (S.D.N.Y. July 16, 2002). In determining whether the imposition of prejudgment interest is appropriate, the Second Circuit looks to "(i) the need to fully compensate the wronged party for actual damages suffered, (ii) considerations of fairness and the relative equities of the award, (iii) the remedial purpose of the statute involved, and/or (iv) such other general principles as are deemed relevant by the court." SEC v. First Jersey, 101 F.3d 1450, 1476 (2d Cir. 1996). Of course, "[i]n an enforcement action brought by a regulatory agency, the remedial purpose of the statute takes on special importance." Id. (discussing prejudgment interest in case brought by the Commission).

These factors favor imposing prejudgment interest. Given the egregious behavior by defendant and the numerous innocent victims, defendant should not be permitted to keep for himself the interest earned on his ill-gotten gains.

Prejudgment interest should be calculated by applying the Internal Revenue Service tax underpayment rate ("IRS rate"), 26 U.S.C. § 6621(a)(2), which the Commission has adopted in connection with administrative proceedings. See Rule 600(b) of the Commission's Rules of Practice, 17 C.F.R. § 201.600(b). The Second

Circuit has upheld the application of the IRS rate in Commission injunctive actions.  See First Jersey, 101 F.3d at 1476-77; see also SEC v. Moran, 944 F. Supp. 286, 295 (S.D.N.Y. 1996).  The IRS rate "reflects what it would have cost to borrow the money from the government and therefore reasonably approximates one of the benefits the defendant derived from the fraud."  First Jersey, 101 F.3d at 1476.  The Commission has calculated prejudgment interest on the $88,465 of ill-gotten gains through the date of this motion.  Based on this calculation, defendant should be ordered to pay $12,407.52 in prejudgment interest in addition to the $88,465.00 in disgorgement.

### C.      Defendant Should Pay a Civil Penalty.

Given the egregiousness of defendant's conduct, this Court should impose a third tier civil penalty against him in the maximum amount of $130,000.   Third tier penalties apply to violations of the Securities Act and Exchange Act which (1) involved "fraud, deceit, manipulation, or deliberate or reckless disregard of a regulatory requirement;" and (2) which "directly or indirectly resulted in substantial losses or created a significant risk of substantial losses to other persons."  15 U.S.C. § 78u(d)(3)(B); 15 U.S.C. § 77t(d)(2). At the time of the relevant conduct here, the effective regulations establish that third tier penalties should not exceed, for any individual defendant, the greater of the "gross pecuniary gain" or $130,000 for each violation.  See 15 U.S.C. § 78(u)(d)(3)(B) and 15 U.S.C. § 77t(d)(2), as adjusted for inflation by 17 C.F.R. § 201.1002 and Table II thereof.[10]  The amount of a civil penalty should be determined "in light of the facts and circumstances."  15 U.S.C. § 78u(d)(3)(B); 15 U.S.C. § 77t(d)(2).

---

[10]      Pursuant to the Debt Collection Improvement Act of 1996 and the Federal Civil Penalties Inflation Adjustment Act of 1990, the Commission increased the maximum amount of civil penalties under the relevant provisions of the federal securities laws in 2005 to account for inflation.  See 17 C.F.R. § 201.1003 and Table III to Subpart E.

Here, as noted above, the conduct was egregious and deliberate, creating a substantial loss for the intruded account holders and the online brokers, who made their intruded accountholders whole.  Moreover, had it not been for the actions of the broker-dealers who noticed Russ' suspicious trading, defendant likely would have continued this scheme and others would have been harmed.  Defendant has also refused to come forward with any defense in this action – instead choosing not to respond to these proceedings.  Accordingly, an award of the maximum allowable civil penalty should be imposed.

Finally, the requested penalty here is important to the future protection of investors.  Aside from the obvious goal of punishing wrongdoers, civil penalties play an equally important role in deterring future conduct that harms investors.  See SEC v. Opulentica, 479 F. Supp.2d 319, 331 (S.D.N.Y. 2007) ("Civil penalties are designed to punish the individual violator and deter future violations of the securities laws.").  The House Report on the Penalty Act made clear its intention, stating:

> The Committee believes that the money penalties proposed in this legislation are needed to provide financial disincentives to securities law violations other than insider trading . . . . Absent a criminal prosecution or a private suit for damages. . . even the defendant who makes a deliberate decision to violate the law and causes significant harm to the markets does not risk any monetary sanction more severe than an order of disgorgement. Disgorgement merely requires the return of wrongfully obtained profits; it does not result in any actual economic penalty or act as a financial disincentive to engage in securities fraud. A violator who avoids detection is able to keep the profits resulting from illicit activities. Currently, even a violator who is caught is required merely to give back his gains with interest, leaving him no worse off financially than if he had not violated the law. The Committee therefore concluded that authority to seek or impose substantial money penalties, in addition to the disgorgement of profits, is necessary for the deterrence of securities law violations that otherwise may provide great financial returns to the violator.

H.R. Rep. No. 101-616, 101st Cong., 2d Sess., reprinted in 1990 U.S. Code Cong. & Admin. News 1379, 1384-86. The courts similarly recognize this goal of civil penalties. Indeed, as one recent court noted, "Without civil penalties, the only financial risk to violators is forfeiture of their ill-gotten gains." SEC v. Koenig, No. 02 C 2180, 2007 U.S. Dist. Lexis 88396, at *20 (N.D. Ill. Dec. 3, 2007). This is particularly true here, where the conduct presents a novel way of committing fraud, there was no parallel criminal prosecution, and thus, the Commission is the only enforcement agency prosecuting this egregious fraud. The imposition of a third tier penalty of $130,000 is warranted.

> **D.    The Court Should Enter An Order Freezing Russ' Assets Held by Penson and TD Ameritrade and Directing those Assets to be Transmitted to the Court.**

While Russ was able to wire significant portions of his ill-gotten gains to a Latvian bank, he was unable to transfer all of his gains before being detected. After detecting Russ' suspicious trading activity, TD Ameritrade, and Penson suspended all trading and withdrawals in Russ' accounts. The current value in Russ' accounts at TD Ameritrade and Penson is $2,375.86 and $27,369.41, respectively. See Declaration of Timothy L. Keninger at ¶ 17 (6/26/08), Exhibit A; Declaration of Kimberly Miller at ¶ 12, Exhibit C. The Court should exercise jurisdiction over those funds by ordering a freeze and directing TD Ameritrade and Penson to transmit those funds to the Court in partial satisfaction of the amounts owed by Russ as a result of judgment to be entered against him. Once the funds have been transmitted to the Court, the Commission intends to ask the Court to direct the Clerk to issue three checks, one to TD Ameritrade, one to Scottrade, and one to E*Trade, in order to redistribute those funds among the broker-

dealers who absorbed the innocent account holders' losses.  <u>See</u> Declaration of James

Hassler at ¶ 12, Exhibit D (Scottrade returned its customer's intruded account to its

original position, absorbing the $7,508.75 loss itself.); Declaration of James Autrey at

¶¶ 12, 18 & 24, Exhibit E (E*Trade returned its customers' intruded accounts to their

original position, absorbing the $131,827.61 loss itself.); Declaration of Timothy L.

Keninger at ¶ 24, Exhibit F (TD Ameritrade returned its customers' intruded accounts to

their original position, absorbing the $200,592.92 loss itself.).[11]

<u>**CONCLUSION**</u>

For the reasons stated above, the Commission respectfully requests that this Court

grant the Commission's motion and order the requested relief.


Respectfully submitted,


<u>s/ Scott A. Thompson</u>
Scott A. Thompson
Tami S. Stark (TS-8321)

Attorneys for Plaintiff

**SECURITIES AND EXCHANGE
COMMISSION**
Mellon Independence Center
701 Market Street, Suite 2000
Philadelphia, PA  19106
Telephone: (215) 597-3100
Facsimile: (215) 597-2740

Dated: July 17, 2008

---

[11]    In the process of obtaining the declarations stating the current amounts held by
TD Ameritrade and Penson in the Russ accounts, the Commission explained its intention
to request a Court-ordered freeze of the assets and an order directing those assets be
turned over to the Court for redistribution.  Neither TD Ameritrade nor Penson had any
objection to this plan.  <u>See</u> Declaration of Scott A. Thompson at ¶ 20, Exhibit G.

# **Exhibit A**

*Securities and Exchange Commission v. Anatoly Russ*, Civ. No. 08cv0415 (LBS)

**REDACTED**

## DECLARATION OF TIMOTHY L. KENINGER

I, Timothy L. Keninger, pursuant to 28 U.S.C. §1746, declare as follows:

1.     I make this Declaration of my personal knowledge and am competent to testify thereto.

2.     I am an adult resident of the State of Nebraska.

3.     I am employed by TD Ameritrade, Inc. ("TD Ameritrade") as Director, Compliance Operations.

4.     I have been employed by TD Ameritrade since May 25, 1995.  My primary duties include day-to-day management of TD Ameritrade's Client and Regulatory Relations.

5.     I have been employed in the securities industry since January 1993 and I hold Series 63, 7, 4 and 24 Registrations.

6.     TD Ameritrade is a member broker-dealer of the Financial Industry Regulatory Authority (FINRA).  Its principal office is located in Bellevue, Nebraska.

7.     TD Ameritrade customers are able to place orders to purchase or sell securities by accessing their brokerage accounts online.  A TD Ameritrade brokerage account can only be accessed online by entering into the website a unique username and password that is assigned to each customer.

8.     TD Ameritrade has procedures reasonably designed to detect and prevent fraudulent or manipulative activity from occurring in client accounts.  TD Ameritrade

Compliance and Fraud Analysts are responsible for the assessment of account activity to determine whether fraudulent or manipulative activity has occurred in an account.

9.    TD Ameritrade Account Number ███████39, titled in the name of Anatoly Russ ("Russ Account"), was opened on August 10, 2006. In an email dated August 22, 2006, Anatoly Russ confirmed to TD Ameritrade that he was funding the account with money wired from account ████████████████00 at Parex Banka, located in Latvia. The Russ Account was funded with a wire in the amount of $1,980.00 on August 22, 2006. The funds were received from American Express Centurion Bank and the sender listed was Anatolij Russ. No other deposits have been made to the account since that time.

10.    On August 23, 2006, at 10:36 a.m. ET, the Russ Account purchased 320 contracts of iShares Trust Lehman Aggregate Bond Fund March 97 Puts (symbol AGG-OO) at a price of $.05. On August 23, 2006, at 10:45 a.m. ET, the Russ Account sold 320 contracts of AGG-OO at a price of $.80. The purchase and subsequent sale of the 320 contracts of AGG-OO generated a gross profit of $24,000.00 (excluding commission charges) in the Russ Account.

11.    On August 23, 2006, TD Ameritrade wired $15,000.00 from the Russ account ███████39 to account number ████████████00 at Parex Banka, located in Latvia. On August 24, 2006, TD Ameritrade wired an additional $5,000.00 from the Russ Account to account number ████████████00 at Parex Banka, located in Latvia. Both requests were processed per faxed letters of instruction signed by Anatoly Russ, in accordance with TD AMERITRADE's established policies and procedures.

12.     On August 28, 2006, at 9:54 a.m. ET, an order to purchase 500 AGG-OO option contracts was placed from the Russ Account. On August 28, 2006, at 9:59 a.m. ET, 340 contracts were purchased from Russ Account at a price of $.10. On August 28, 2006, between 10:56 a.m. and 11:08 a.m. ET, the Russ Account sold 166 contracts of AGG-OO at a price of $.95. The purchase of the 340 contracts and subsequent sale of the 166 contracts of AGG-OO generated a gross profit of $12,370.00 (excluding commission charges).

13.     On August 28, 2006, TD Ameritrade wired $15,000.00 from the Russ Account to account number ███████████████00 at Parex Banka, located in Latvia. The wire request was processed per a faxed letter of instruction signed by Anatoly Russ, in accordance with TD AMERITRADE's established policies and procedures.

14.     On August 28, 2006 at 1:10pm ET, E*Trade Financial sent an email to TD Ameritrade stating that two of their existing client accounts had been taken over by an unknown perpetrator. According to E*Trade Financial, the funds in their clients' accounts had been used to buy a large number of AGG-OO options. Immediately upon this notice, TD Ameritrade searched its order entry system for trades in AGG-OO options. TD Ameritrade located the trades in AGG-OO made from the Russ Account. Based on the information received from E*Trade Financial and the nature of the trading activity in the Russ Account, TDAMERITRADE placed a "No Funds Out restriction" on the assets in the Russ Account, on August 28, 2006, pending further investigation. This restriction prohibited further withdrawals but did not prohibit trading activity.

15.     On August 31, 2006 at 9:50 a.m. ET, an order to sell the remaining 174 AGG-OO option contracts was placed from the Russ Account. On August 31, 2006, between 9:52 a.m. and 10:12 a.m. ET, the Russ Account sold 174 contracts of AGG-OO at a price of $.80. After the August 31, 2006 sale of 174 contracts of AGG-OO, TD Ameritrade was contacted by Options Xpress Inc. Options Xpress stated that one of their existing client accounts had been taken over by an unknown perpetrator. According to Options Xpress, Inc., the funds in the identified account had been used to buy a large number of AGG-OO options. TD AMERITRADE determined that the purchase of the AGG-OO contracts in the account identified by Options Xpress matched the sale of the 174 AGG-OO contracts in the Russ Account. At the request of Options Xpress and TD Ameritrade, the trade was successfully canceled with the assistance of the market maker (Interactive Brokers) and the exchange (Philadelphia).

16.     On August 31, 2006, two additional requests to withdraw funds, in the amount of $15,000, by wire were made by Anatoly Russ. Both requests were cancelled by TD Ameritrade. On August 31, 2006 Anatoly Russ made an email inquiry to TD Ameritrade regarding the cancellation of the wire withdrawals. TD AMERITRADE advised Anatoly Russ that the remaining funds in the account were not available for withdrawal pending further research by TD AMERITRADE. No further withdrawal attempts or contacts from Anatoly Russ have been received since August 31, 2006.

17.     The Russ Account currently has a balance of $2,375.86.

18.     TD Ameritrade has provided to the Securities and Exchange Commission records relating to the unauthorized trades, including, but not limited to: (a) the affected customers' names, account numbers and contact information, (b) the unauthorized

- 4 -

Internet Protocol addresses used to access each of the accounts, and (c) detailed order information for the underlying trades.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on 6 - 26 , 2008

Timothy L. Keninger

# **Exhibit B**

*Securities and Exchange Commission v. Anatoly Russ*, **Civ. No. 08cv0415 (LBS)**

## DECLARATION OF ILA JEHL

I, Ila Jehl, declare as follows:                                    **REDACTED**

1.    I am an adult resident of the State of Texas.

2.    I have been in the securities industry since 1991 and hold Series 7, 24 and 63
      registrations.

3.    I have been employed by Penson Financial Services, Inc. ("Penson") since
      September of 1996.  Currently, my position is Senior Vice President and my
      duties include Execution Services and Agency Trading.

4.    Penson is a FINRA member broker-dealer with its principal office in Dallas,
      Texas.

5.    Penson provides clearing services for approximately 200 broker dealers, including
      NobleTrading.com, Inc., located in New York.  Penson started clearing for Noble
      in or about June of 2005.

6.    On or around September 18, 2006, Penson was contacted by the Philadelphia
      Stock Exchange ("PHLX") regarding Noble account ▮▮▮59, under the name
      of Anatoly Russ.  PHLX indicated there was some questionable option trading in
      the account and put Penson in contact with the contra-party, Ameritrade, to aid in
      the investigation of the matter.  Ameritrade indicated that an Ameritrade account
      had been breached by an unknown third party who may have placed trades.
      Based on information provided by Ameritrade and the PHLX, I instructed others
      at Penson to freeze the Noble account to prevent additional unauthorized trades.

        Executed:   September 21, 2007

                                          _____
                                                   Ila Jehl

# Exhibit C

*Securities and Exchange Commission v. Anatoly Russ*, Civ. No. 08cv0415 (LBS)

**REDACTED**

## DECLARATION OF KIMBERLY MILLER

I, Kimberly Miller, hereby declare as follows:

1.  I am an adult resident of the State of Texas.

2.  I am employed as the Corporate Books & Records Custodian for Penson Financial Services, Inc. ("Penson").

3.  Penson is an FINRA member broker-dealer with its principal office in Dallas, Texas.

4.  I have been employed by Penson since March 2000.

5.  I have been in the securities industry since March 2000 and hold Series 7 and Series 63 registrations.

6.  Penson provides clearing services for approximately 200 broker dealers, including NobleTrading.com, Inc., located in New York, NY.  Penson has been providing clearing services for NobleTrading.com since approximately June 2005.

7.  Account opening records reveal that NobleTrading.com account, number ███59, in the name of Anatoly Russ ("Russ account") was opened on September 5, 2006, and was capitalized on September 6, 2006 with an initial deposit of $17,273.15 wired to the Russ account.  An additional $24,750.41 was wired to the Russ account on September 8, 2006.  The wire transfers originated from an account held by Anatoly Russ at OptionsXpress, Inc., number ███29.

8.  Penson customers are able to wire funds from their accounts by submitting correct wiring instructions through their introducing broker.  Once the wire information has been submitted online and approved by the broker the wire is forwarded to Penson for approval.  Based on the dollar amount of the wire there are different levels of approval.  Once the wire is approved it is sent via upload file by the Banking Department to JPMorgan/Chase Access.  JPMorgan/Chase then processes the wire request.

    At times Penson will receive a foreign bank wire request that has to be submitted manually by the Banking Department on JPMorgan/Chase Access.  The written request is received in the Margins Department by the broker and goes through a manual approval process and is given to the Banking Department.  The information from the written request is directly entered by an authorized individual in the department.  Once the instructions are completed the funds are reviewed and released by someone in the department other than the individual who input the wire.

9.    On September 8, 2006, at Russ' request, Penson wired $15,000 from the Russ account to account, number ██████████00, at JSC Parex Bank, located in Latvia. On September 12, 2006, at Russ' request, Penson wired an additional $15,000 to that Parex Bank account.

10.   On September 19, 2006, at 10:53 a.m., the Russ account purchased 25 AGG March 07 105 put options contracts (symbol "AGGOA") at $4.20. Shortly thereafter, at 11:04 a.m., the Russ account sold the AGGOA contracts at $6.70. This trade generated a profit of $6,250 (without commissions).

11.   On September 19, 2006, at 11:55 a.m., the Russ account purchased 100 AGG March 07 99 put options contracts (symbol "AGGOU") at $1.00. Shortly thereafter, at 12:01 p.m., the Russ account sold 40 AGGOU contracts at $2.00. Between 12:24 p.m. and 12:25 p.m., the Russ account sold another 60 AGGOU contracts at $1.90. These trades generated a profit of $9,400 (without commissions).

12.   The Russ account has a current cash balance of $27,369.41.

Kimberly Miller

Executed: June 26, 2008

2

# Exhibit D

*Securities and Exchange Commission v. Anatoly Russ*, **Civ. No. 08cv0415 (LBS)**

**DECLARATION OF James Hassler**                    <u>REDACTED</u>

I, James Hassler, hereby declare as follows:

1.    I am an adult resident of the State of Missouri.

2.    I am employed as a Senior Fraud Analyst for Scottrade, Inc.

3.    Scottrade is a member broker-dealer of the Financial Industry Regulatory
      Authority (FINRA).  Its principal office is located in St. Louis, MO.

4.    I have been employed by Scottrade since May of 2006.  My primary duties
      include the analysis and investigation of proprietary fraud detection systems,
      client account fraud data, and shared fraud information to discover and prevent
      account pump-and-dump intrusions.

5.    I have been in the securities industry since May of 2006 and hold Series 7, 63, and
      24 registrations.

6.    Scottrade customers are able to place their own trades by accessing their
      brokerage accounts online.  A brokerage account can only be accessed online by
      using a personalized username and password that is given to each customer.

7.    Analysts working in Scottrade's Risk Management Department are responsible
      for investigating and confirming account intrusion activity.   Determinations are
      made by assessing account DNS information (IP address analysis), account user
      agent information, previous account activity, and any fraud information that has
      been shared by competitor firms.

8.    Scottrade maintains an account, number [redacted]86, which was previously
      designated as ▮▮▮▮86, in the name of Jean Augusma ("Augusma account").
      According to account records, Jean Augusta is the only person authorized to
      access the Augusta account and to transact trades in the account.

9.    On August 28, 2006, between 10:44 a.m. and 10:46 a.m., sell orders were placed
      in the Augusma account, resulting in the liquidation of various stocks from the
      account.

10.   On August 28, 2006, at 10:56 a.m., the Augusma account purchased 100 March
      07 97 put options contracts on iShares Lehman Aggregate Bond Fund (symbol
      "AGGOO") at $1.00.

11.   On August 28, 2006, Scottrade's Risk Management Department determined that
      the purchases of AGGOO options contracts in the Augusma account, as described
      above, were not placed by Jean Augusma and were not authorized by him.  On

1

August 28, 2006, Scottrade's Risk Management Department also determined that the sales of various stocks on August 28th in the Augusma account, as described above, were not placed by Jean Augusma and were not authorized by him. Under the circumstances, Scottrade determined that the unauthorized trades in the Augusma account were initiated as part of an online fraud. Scottrade has made this determination by analyzing and investigating DNS information (IP address analysis), account user agent information, previous account activity, and fraud information that has been shared by competitor firms.

12. The unauthorized trades of AGGOO options contracts in the Augusma account referenced above as well as additional related unauthorized trades resulted in a total loss of $7,508.75. Although not legally obligated to do so, Scottrade restored the Augusma account to its original state by reimbursing the account for the losses and restoring the securities positions as they existed prior to the unauthorized trading.

13. Scottrade has concluded that the unauthorized trades were likely caused by someone gaining unauthorized access to the usernames and passwords for the Augusma account. A review of the login history of the Augusma account indicates that entry into the account on the day the unauthorized trading occurred was accomplished via Scottrade's secure website using the unique username and password for the Augusma account.

14. The securities were removed from the Augusma account and billed into Scottrade's internal error account. Scottrade sent the client a security certification letter describing the situation, as well as free antivirus software to assist in improving the client's internet security.

15. Scottrade has provided to the U.S. Securities and Exchange Commission documentation relating to the Augusma account referenced above, including (1) account opening documents; (2) correspondence; (3) order tickets; (4) monthly account statements; and (5) account login and internet protocol histories, for the relevant time period.

James Hassler

Executed:   October 10, 2007
20071010 Hassler Declaration Redacted - Scottrade.doc

2

.

# __Exhibit E__

*Securities and Exchange Commission v. Anatoly Russ*, **Civ. No. 08cv0415 (LBS)**

## DECLARATION OF JAMES AUTREY <span style="float:right">REDACTED</span>

I, James Autrey, hereby declare as follows:

1.  I am an adult resident of the Commonwealth of Virginia.

2.  I am employed as the Senior Manager of Corporate Security Investigations for E*TRADE Financial Corporation ("E*TRADE").

3.  E*TRADE is the indirect parent company of E*TRADE Securities LLC ("ETS"), an NASD member broker-dealer. E*TRADE's principal office is in New York, New York.

4.  I have been employed by E*TRADE since July 1996. My primary duties include managing internal and external corporate investigations.

5.  I have been in the securities industry since May 1993 and hold Series 4, 7, 24, and 63 registrations.

6.  ETS customers are able to self-direct trades by accessing their brokerage accounts online. A customer can only access an ETS brokerage account online by entering a personalized username and password into the ETS website.

7.  When investigating potential unauthorized trading activity in a customer's account, an investigator from E*TRADE's Corporate Security Investigations group ("CSI") typically will obtain a sixty (60) day Internet Protocol ("IP") address login history of the customer account and compare the IP addresses that accessed the account when there was no suspicious trading activity to the IP address that logged into the account at the time of the alleged unauthorized trading activity. Specifically, the investigator analyzes the IP address login history to determine whether the IP address in question is out-of-pattern in that it originated from a different geographical area than the address on the account registration or used a different Internet Service Provider than the prior IP addresses. Finally, if additional information is needed from the customer to establish a login pattern, the account holder is contacted by ETS Customer Service to obtain the relevant information.

8.  ETS maintains an account, number [redacted]48, in the name of James S. Parisi and Patricia E. Parisi ("Parisi account"). According to account records, James S. Parisi and Patricia E. Parisi are the only persons authorized to access the Parisi account and to transact trades in the account.

9.  On August 23, 2006, between 10:24 a.m. and 10:35 a.m., the Parisi account purchased 505 March 07 97 put options contracts on iShares Lehman Aggregate Bond Fund (symbol "AGGOO") at $.70 to $1.00.

1

10.    On August 23, 2006, at 10:36 a.m., the Parisi account sold 320 AGGOO options contracts at $.05. Shortly thereafter, at 10:45 a.m., the Parisi account purchased 320 AGGOU options contracts at $.80.

11.    On August 25, 2006, CSI determined that the sales and purchases of the AGGOO options contracts on August 23rd in the Parisi account, as described above, were not placed by James S. Parisi or Patricia E. Parisi and were not authorized by either of them. Under the circumstances, CSI determined that the unauthorized trades in the Parisi account were initiated as part of an online fraud. CSI has made this determination in part by interviewing the customer and by reviewing the sixty (60) day IP login history of the Parisi account and confirming that the IP address that was used to access the Parisi account on August 23, 2006 was out-of-pattern.

12.    The unauthorized sales and purchases of AGGOO options contracts in the Parisi account referenced above as well as additional related unauthorized trades resulted in a total loss of $88,375.35. ETS has restored the Parisi account to its original state by reimbursing the account for the losses and restoring the securities positions as they existed prior to the unauthorized trading activity.

13.    ETS maintains an account, number [redacted]53, in the name of Alexander Babinski ("Babinski account). According to account records, Alexander Babinski is the only person authorized to access the Babinski account and to transact trades in the account.

14.    On August 28, 2006, between 9:35 a.m. and 9:45 a.m., buy and sell orders were placed in the Babinski account. As a result, various stocks were liquidated from the account.

15.    On August 28, 2006, at 9:57 a.m., the Babinski account purchased 340 AGGOO options contracts at $.90 and $1.00.

16.    On August 28, 2006, at 9:59 a.m., the Babinski account sold 340 AGGOO options contracts at $.10.

17.    On August 28, 2006, CSI determined that the sales and purchases of the AGGOO contracts on August 28, 2006 in the Babinski account, as described above, were not placed by Alexander Babinski and were not authorized by him. Under the circumstances, CSI determined that the unauthorized trades in the Babinski account were initiated as part of an online fraud. CSI has made this determination in part by interviewing the customer and by reviewing the sixty (60) day IP login history of the Babinski account and confirming that the IP address that was used to access the Babinski account on August 28, 2006 was out-of-pattern.

18. The unauthorized sales and purchases of AGGOO options contracts in the Babinski account referenced above as well as additional related unauthorized trades resulted in a total loss of $37,535.21. ETS has restored the Babinski account to its original state by reimbursing the account for the losses and restoring the securities positions as they existed prior to the unauthorized trading activity.

19. ETS maintains an account, number [redacted]34, in the name of Aaron M. Troutman ("Troutman account). According to account records, Aaron Troutman is the only person authorized to access the Troutman account and to transact trades in the account.

20. On August 28, 2006, between 11:06 a.m. and 11:08 a.m., sell orders were placed in the Troutman account, resulting in the liquidation of various stocks from the account.

21. On August 28, 2006, at 11:07 a.m., the Troutman account purchased 50 AGGOO options contracts at $.95.

22. On August 28, 2006, at 11:08 a.m., the Troutman account purchased 16 AGGOO options contracts at $.95.

23. On August 28, 2006, CSI determined that the purchases of the AGGOO contracts on August 28, 2006 in the Troutman account, as described above, were not placed by Alexander Troutman and were not authorized by him. Under the circumstances, CSI determined that the unauthorized trades in the Troutman account were initiated as part of an online fraud. CSI has made this determination in part by interviewing the customer and by reviewing the sixty (60) day IP login history of the Troutman account and confirming that the IP address that was used to access the Troutman account on August 28, 2006 was out-of-pattern.

24. The unauthorized purchases of AGGOO options contracts in the Troutman account referenced above as well as additional related unauthorized trades resulted in a total loss of $5,917.05. ETS has restored the Troutman account to its original state by reimbursing the account for the losses and restoring the securities positions as they existed prior to the unauthorized trading activity.

25. ETS has concluded that the unauthorized trades were likely caused by someone gaining unauthorized access to the usernames and passwords for the Parisi, Babinski, and Troutman accounts. A review of the login histories of the Parisi, Babinski, and Troutman accounts on the days the unauthorized trading occurred was accomplished via ETS' secure website using the unique usernames and passwords for these accounts.

Autrey declaration REVISED REDACTED Oct 5 2007.doc

26.    E*Trade has provided the U.S. Securities and Exchange Commission documentation relating to the Parisi, Babinski, and Troutman accounts referenced above, including (1) account opening documents; (2) correspondence; (3) order tickets; (4) monthly account statements; and (5) account login and internet protocol histories for the relevant time period.

JAMES AUTREY

Executed:   October 11, 2007

# Exhibit F

*Securities and Exchange Commission v. Anatoly Russ*, **Civ. No. 08cv0415 (LBS)**

**REDACTED**

## DECLARATION OF TIMOTHY L. KENINGER

I, Timothy L. Keninger, pursuant to 28 U.S.C. §1746, declare as follows:

1.    I make this Declaration of my personal knowledge and am competent to testify thereto.

2.    I am an adult resident of the State of Nebraska.

3.    I am employed by TD Ameritrade, Inc. ("TD Ameritrade") as Director, Compliance Operations.

4.    I have been employed by TD Ameritrade since May 25, 1995.  My primary duties include day-to-day management of TD Ameritrade's Client and Regulatory Relations.

5.    I have been employed in the securities industry since January 1993 and I hold Series 63, 7, 4 and 24 Registrations.

6.    TD Ameritrade is a member broker-dealer of the Financial Industry Regulatory Authority (FINRA).  Its principal office is located in Bellevue, Nebraska.

7.    TD Ameritrade customers are able to place orders to purchase or sell securities by accessing their brokerage accounts online.  A TD Ameritrade brokerage account can only be accessed online by entering into the website a unique username and password that is assigned to each customer.

8.    TD Ameritrade has procedures reasonably designed to detect and prevent fraudulent or manipulative activity from occurring in client accounts.  TD Ameritrade

Compliance and Fraud Analysts are responsible for the assessment of account activity to determine whether fraudulent or manipulative activity has occurred in an account.

9.    TD Ameritrade Account Number ▮▮▮▮36 is titled in the name of James Yu ("Yu account"). On September 19, 2006, at 12:24 p.m., Eastern Time ("ET"), 20 contracts of the iShares Lehman Aggregate Bond Fund March 99 Put options (symbol "AGG-OU") were purchased from the Yu account at a price of $1.90 per contract. On September 19, 2006, at 12:25 p.m. ET, 40 contracts of AGG-OU options were purchased from the Yu account at a price of $1.90 per contract.

10.    TD Ameritrade's Fraud and Surveillance Department determined that the trades to purchase contracts of AGG-OU options on September 19, 2006 in the Yu account were not authorized by the account owner. TD Ameritrade made this determination in part by interviewing the customer, comparing the IP addresses of previous trades placed by the customer with the IP addresses used to place the questioned trades on September 19, 2006, and by the manipulative nature of the trades (i.e., aggressive orders meant to influence the price of the stock with little regard for gain or loss in the account).

11.    The unauthorized trades of AGG-OU option contracts in the Yu account referenced above as well as additional related unauthorized trades resulted in a total loss of $8,700.33. TD Ameritrade has restored the account to the position it was in prior to the unauthorized trading activity.

12.    TD Ameritrade Account Number ▮▮▮▮73 is titled in the name of W.G. Timothy Brady ("Brady account"). On September 19, 2006 between 10:40 a.m. and 10:44 a.m. ET, existing positions were sold from the Brady account.

13.    On September 19, 2006, between 10:49 a.m. and 10:50 a.m. Eastern Time ("ET"), 50 contracts of the iShares Lehman Aggregate Bond Fund March 105 Put options (symbol "AGG-OA") were purchased from the Brady account at a price of $7.40 per contract. On September 19, 2006 at 10:53 a.m. ET, 25 contracts of AGG-OA were sold from the Brady account at a price of $4.20 per contract. On September 19, 2006 at 11:04 a.m. ET, 25 contracts of AGG-OA were purchased from the Brady account at a price of $6.70 per contract.

14.    On September 19, 2006 between 11:50 a.m. and 11:52 a.m. ET, 100 contracts of AGG-OU were purchased from the Brady account at prices ranging from $2.90 per contract to $3.50 per contract. On September 19, 2006 at 11:55 a.m. ET, 100 contracts of AGG-OU were sold from the Brady account at a price of $1.00 per contract. On September 19, 2006 at 12:01 p.m. ET, 40 contracts of AGG-OU were purchased from the Brady account at a price of $2.00 per contract.

15.    TD Ameritrade's Fraud and Surveillance Department determined that the trades to purchase and sell contracts of AGG-OA and AGG-OU options on September 19, 2006 in the Brady account were not authorized by the account owner. TD Ameritrade made this determination in part by interviewing the customer, comparing the IP addresses of previous trades placed by the customer with the IP addresses used to place the questioned trades on September 19, 2006, and by the manipulative nature of the trades (i.e., aggressive orders meant to influence the price of the stock with little regard for gain or loss in the account).

16.    The unauthorized trades of AGG-OA and AGG-OU option contracts in the Brady account referenced above as well as additional related unauthorized trades resulted

- 3 -

in a total loss of $47,156.90. TD Ameritrade has restored the account to the position it was in prior to the unauthorized trading activity.

17.    TD Ameritrade Account Number ███████57 is titled in the name of Samir Shroff and Akruti Shroff ("Shroff account"). On September 5, 2006 between 9:53 a.m. and 10:33 a.m. ET, an existing position was sold from the Shroff account.

18.    On September 5, 2006 between 9:59 a.m. and 10:02 a.m. ET, 110 contracts of AGG-OU were purchased from the Shroff account at a price of $3.00 per contract. On September 5, 2006 at 10:10 a.m. ET, 38 contracts of AGG-OU were sold from the Shroff account at a price of $.55 per contract. On September 5, 2006 at 10:19 a.m. ET, 38 contracts of AGG-OU were purchased from the Shroff account at a price of $2.95 per contract.

19.    On September 5, 2006 at 10:32 a.m. ET, 45 contracts of AGG-OU were sold from the Shroff account at a price of $.60 per contract. On September 5, 2006 between 10:40 a.m. and 10:44 a.m. ET, 28 contracts of AGG-OU were purchased from the Shroff account at a price of $2.95 per contract.

20.    On September 6, 2006 between 10:18 a.m. and 12:17 p.m. ET, existing positions were sold from the Shroff account. On September 6, 2006 at 12:19 p.m. ET, 7 contracts of AGG-OU were purchased from the Shroff account at a price of $2.95 per contract.

21.    On September 7, 2006, between 10:58 a.m. and 11:07 a.m. ET, 140 contracts of the iShares Lehman Aggregate Bond Fund March 100 Put options (symbol "AGG-OV") were purchased from the Shroff account at prices ranging from $2.90 per contract to $4.00 per contract. On September 7, 2006 at 11:17 a.m. ET, 90 contracts of AGG-OV

were sold from the Shroff account at a price of $.10 per contract. On September 7, 2006 at 11:21 a.m. ET, 40 contracts of AGG-OV were purchased from the Shroff account at a price of $3.60 per contract. On September 7, 2006 at 11:30 a.m. ET, 20 contracts of AGG-OV were purchased from the Shroff account at a price of $2.80 per contract.

22. . TD Ameritrade's Fraud and Surveillance Department determined that the trades to purchase and sell contracts of AGG-OU on September 5th and 6th and the trades to purchase and sell AGG-OV options on September 7, 2006 in the Shroff account were not authorized by the account owner. TD Ameritrade made this determination in part by interviewing the customer, comparing the IP addresses of previous trades placed by the customer with the IP addresses used to place the questioned trades on September 5th, 6th, and 7th, 2006, and by the manipulative nature of the trades (i.e., aggressive orders meant to influence the price of the stock with little regard for gain or loss in the account).

23. The unauthorized trades of AGG-OU and AGG-OV option contracts in the Shroff account referenced above as well as additional related unauthorized trades resulted in a total loss of $144,735.69. TD Ameritrade has restored the account to the position it was in prior to the unauthorized trading activity.

24. The total net loss to TD Ameritrade resulting from the foregoing intrusions and TD Ameritrade's efforts to make the customers whole was $200,592.92.

25. TD Ameritrade believes the cases outlined above are examples of unauthorized trading and the customers previously referenced appear to be victims of an account takeover. Each customer account has a UserID and Password that is unique to that account. These credentials are required to access the customer account via the

internet. The account credentials needed to access these accounts were acquired directly from the customers. It is likely that the account credentials were acquired through internet based schemes such as phishing, pharming or Trojan keylogging programs. The perpetrator(s) subsequently utilized the stolen account credentials to access our customer accounts via the Internet and place the trades in question. At the time the accounts were accessed, TD Ameritrade had no reason to believe that someone other than the customer accessed the account.

26.     TD Ameritrade has provided to the Securities and Exchange Commission records relating to the unauthorized trades, including, but not limited to: (a) the affected customers' names, account numbers and contact information, (b) the unauthorized Internet Protocol addresses used to access each of the accounts, and (c) detailed order information for the underlying trades.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on 9 - 1 8 , 2007

_____
Timothy L. Keninger

# Exhibit G

*Securities and Exchange Commission v. Anatoly Russ*, Civ. No. 08cv0415 (LBS)

SCOTT A. THOMPSON
TAMI S. STARK (TS-8321)
Attorneys for Plaintiff
SECURITIES AND EXCHANGE COMMISSION
701 Market Street
Suite 2000
Philadelphia, PA  19106
Telephone: (215) 597-3100
Telefax: (215) 597-2740

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
_____

SECURITIES AND EXCHANGE COMMISSION,          :
                                                                                      :
                                        Plaintiff,                            :
                                                                                      :
                          v.                                                   :      Civ No. 08CV0415 (LBS)
                                                                                      :
ANATOLY RUSS,                                                      :
                                                                                      :
                                        Defendant.                        :
_____:

## DECLARATION OF SCOTT A. THOMPSON

I, Scott A. Thompson, hereby declare as follows:

1.    I am employed as a Senior Trial Counsel in the Division of Enforcement of

the Securities and Exchange Commission (the "Commission").  My primary duties

include representing the Commission in federal court actions brought by it to enforce the

federal securities laws, and representing the Division of Enforcement in administrative

proceedings authorized by the Commission.

2.    In connection with my duties as Senior Trial Counsel, I am one of the

attorneys assigned to represent the Commission in the above-captioned matter.

3.  On January 16, 2008, the Commission filed a Complaint in which the Commission charged defendant Anatoly Russ with violations of the antifraud provisions of the federal securities laws.

4.  That same day, the Commission issued a "Litigation Release" detailing the allegations of the Complaint.  This Litigation Release (No. 20430), together with the Commission's Complaint filed in this action, is also available on the Commission's website, www.sec.gov.  See http://www.sec.gov/litigation/litreleases/2008/lr20430.htm.

5.  Several online news sources, including at least two Russian news websites, www.kommersant.com, and www.themoscowtimes.com, as well as MSNBC, Business Week, and Yahoo, also published online articles about the filing of the Complaint.  See, e.g., http://www.kommersant.com/p-11944/Russ_SEC_fraud/ (Kommersant); http://www.themoscowtimes.com/stories/2008/01/18/061.html (Moscow Times); http://www.msnbc.msn.com/id/22689228/ (MSNBC); http://www.businessweek.com/ap/financialnews/D8U78KL80.htm (Business Week); http://biz.yahoo.com/ap/080116/sec_russian_trader.html?.v=1 (Yahoo).

6.  Shortly thereafter, on January 23, 2008, the Commission directly notified Russ of the pending litigation by sending him a copy of the Complaint via email.  The Commission's investigation revealed an email address that Russ had used to set up each of the online brokerage accounts he used in perpetrating the fraud described in the Complaint, to send various emails to brokers to inquire as to the status of his accounts, and to follow up on his attempts to wire his ill-gotten gains to his Latvian bank account. The investigation also showed that Russ requested to, and actually did, receive communications from at least some of his brokers at this same email address.

7. After Russ' fraudulent conduct was discovered, and his brokers froze his accounts, email communications sent by at least one broker to Russ began "bouncing back." At the time, this suggested that Russ either had deactivated his account or was using a filter to prevent emails from that broker from reaching him.

8. It now appears that Russ' email account remained active. The January 23, 2008 email to Russ sending him a copy of the Commission's Complaint and notifying him of this action did not "bounce back" and was not otherwise returned.

9. In addition to determining Russ' email address, as a result of the investigation, the Commission also identified three mailing addresses that Russ had provided to his online brokers, as well as a mailing address he had provided to the Latvian bank to which he wired the proceeds of his fraudulent trading. Two of the addresses are post office boxes in St. Petersburg, Russia, and two appear to be regular street addresses. The most reliable address (other than the email address) appeared to be the mailing address Russ gave to the Latvian bank where Russ deposited his illegal proceeds, as that address is in the same small town listed on Russ' passport (Novaya Ladoga), located about 80 miles from St. Petersburg.

10. On February 4, 2008, the Commission filed an Ex Parte Motion to Serve Defendant Anatoly Russ by Alternative Means, because Russ is a resident of Russia.

11. The Court granted the Commission's motion on February 5, 2008, allowing the Commission 60 days to effect service, alternatively, by email, international courier (to the two street addresses used by Russ) and international registered mail (to the two post office box addresses used by Russ).

12.  On February 7, 2008, the Commission sent copies of the Summons and Complaint, along with the Court's February 5, 2008 Order by international courier (Federal Express tracking numbers 790933877956 and 799797917599) and international registered mail (USPS tracking numbers RB784617893US and RB784617902US) to the addresses listed in the Order.

13.  On February 11, 2008, the Commission also sent an email to Russ attaching the Summons and Court's Order, and intending to attach a copy of the Complaint. However, due to a clerical error, the proper Complaint was not attached to the email.  The email did not bounce back.

14.  On February 20, 2008, upon discovering the prior clerical error, the Commission sent another email to Russ.  That email properly attached the Complaint, Summons, and a copy of the Court's February 5, 2008 Order.  The email also did not bounce back.

15.  On March 4, 2008, the packages sent to Russ by international registered mail were returned to the Commission with a label marked as "Inconnu," meaning "unknown."  The Commission has not been able to determine more information about why the packages were returned.

16.  On March 4, 2008, one of the Federal Express packages was also returned as undeliverable, without further explanation (tracking number 799797917599).  On March 14, the other Federal Express package (tracking number 790933877956) was returned as undeliverable and designated "incorrect address."  The Commission has not been able to determine more information about why the packages were returned.

17. On March 26, 2008, the Commission filed an Affidavit of Service with the Court describing this process. Interestingly, when the Commission attempted to serve a copy of that affidavit on Mr. Russ via email to the same email address for which previous communication was received, the email bounced back.

18. Upon learning that the email bounced back, the Commission once again reached out to the Latvian bank to which Russ had wired his ill-gotten gains to see if it had any new contact information for Russ.

19. On April 30, 2008, the Latvian bank reported back that it had no additional contact information for Mr. Russ.

20. In the process of obtaining the declarations stating the current amounts held by TD Ameritrade, Inc. and Penson Financial Services, Inc. in the Russ accounts, the Commission explained its intention to request a Court-ordered freeze of those assets and an order directing those assets be turned over to the Court for redistribution. Neither TD Ameritrade nor Penson had any objection to this plan.

I make this declaration pursuant to 18 U.S.C. § 1746 and declare under penalty of perjury that the foregoing is true and correct to the best of my personal knowledge, information, and belief.

_Scott A. Thompson_
Scott A. Thompson

Attorney for Plaintiff:

**SECURITIES AND EXCHANGE
COMMISSION**
Mellon Independence Center
701 Market Street, Suite 2000
Philadelphia, PA 19106
Telephone: (215) 597-3100
Facsimile: (215) 597-2740

Dated: July _17_, 2008

# **Exhibit H**

*Securities and Exchange Commission v. Anatoly Russ*, Civ. No. 08cv0415 (LBS)



**FINANŠU UN
KAPITĀLA
TIRGUS
KOMISIJA**

Riga, 30 April 2008
Our ref.: 01.03.06/1295

Mr. Alberto Arevalo
Assistant Director
U.S. Securities and Exchange Commission
Office of International Affairs
Washington, DC 20549-1004

On Provision of Information

Dear Mr. Arevalo

With reference to your letter dated 9 April 2008 regarding the JSC *Parex Bank's* client Mr.
Anatoly Russ, please be advised that the Financial and Capital Market Commission (the
FCMC) has forwarded to the JSC *Parex Bank* (hereinafter – the Bank) the request to provide
information at its disposal regarding the new address and contact details of Mr. Russ (e-mail,
fax, phone etc.). According to the information provided by the Bank to the FCMC, the Bank
does not possess any other information regarding the contact details of Mr. Russ in addition to
the information the Bank had already provided in its letter in response to information inquiry
of 9 August 2007 from the U.S. Securities and Exchange Commission.

We are looking forward to continuing our cooperation in the future.

Yours sincerely,

Jānis Brazovskis
Deputy Chairman
Financial and Capital Market Commission
Republic of Latvia

Tatjana Kuļešova
(+371) 67774860
tatjana.kulesova@fktk.lv

KUNGU IELA 1 · LV–1050 RĪGA · LATVIJA · TĀLRUNIS +371 6777 4800 · FAKSS +371 6722 5755 · E-PASTS FKTK@FKTK.LV

.

# <u>Exhibit I</u>

*Securities and Exchange Commission v. Anatoly Russ*, Civ. No. 08cv0415 (LBS)

AMY J. GREER
SCOTT A. THOMPSON
TAMI S. STARK (TS-8321)
Attorneys for Plaintiff
SECURITIES AND EXCHANGE COMMISSION
701 Market Street    ·
Suite 2000
Philadelphia, PA  19106
Telephone: (215) 597-3100
Telefax: (215) 597-2740

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | : |
| | : |
| Plaintiff, | : |
| | : |
| v. | :  Civ No. 08CV0415 (LBS) |
| | : |
| ANATOLY RUSS, | : |
| | : |
| Defendant. | : |

## CLERK'S CERTIFICATE NOTING
## DEFAULT OF DEFENDANT ANATOLY RUSS

I hereby certify that the Docket Sheet in the above-captioned civil action shows the following:

1.      On January 16, 2008, Plaintiff Securities and Exchange Commission ("Commission") commenced this action with the filing of a Complaint and the issuance of a Summons.

2.      On February 4, 2008, the Commission filed an Ex Parte Motion to Serve Defendant Anatoly Russ by Alternative Means, because Russ is a resident of Russia.

3.      The Court granted the Commission's motion on February 5, 2008, allowing the Commission 60 days to effect service by email, international courier (to the two street addresses used by Russ) and international registered mail (to the two post office box addresses used by Russ).

4.    On March 26, 2008, the Commission filed an Affidavit of Service stating that Russ had been served in accordance with the Court's February 5, 2008 Order on February 20, 2008.

5.    As of the date of this Certificate, there is no entry in the Docket Sheet showing that Russ has ever filed an Answer or other responsive pleading to the Complaint, and his time to do so has expired.

4.    Based on the foregoing, the default of defendant Russ is hereby noted.

Dated: May 25 2008
       New York, New York

Michael McMahon

CLERK, UNITED STATES DISTRICT COURT

By
       DEP CLERK

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

————————————————————————————————
                                          :
SECURITIES AND EXCHANGE COMMISSION,       :
                                          :
                         Plaintiff,       :
                                          :
                         v.               :    Civ No. 08CV0415 (LBS)
                                          :    ECF Case
ANATOLY RUSS,                             :
                                          :
                         Defendant.       :
————————————————————————————————:

### FINAL JUDGMENT ON DEFAULT AND
### ORDER OF PERMANENT INJUNCTION AND
### OTHER RELIEF AGAINST DEFENDANT ANATOLY RUSS

Plaintiff Securities and Exchange Commission (the "Commission") having moved for the
entry of a default judgment against defendant Anatoly Russ, this Court having received no
response from the duly noticed Defendant, and it further appearing that there is no just reason for
delay, and finding that there is sufficient basis herein for the entry of this Final Judgment on
Default and Order of Permanent Injunction and Other Relief Against Defendant Anatoly Russ
("Final Judgment");


**NOW THEREFORE,**

### I.

**IT IS HEREBY ORDERED, ADJUDGED, AND DECREED THAT:**

Plaintiff Commission's motion is hereby GRANTED, and judgment by default is hereby
entered against Defendant Anatoly Russ.

## II.

**IT IS FURTHER ORDERED, ADJUDGED, AND DECREED THAT:**

Defendant Anatoly Russ, and Defendant's agents, servants, employees, attorneys, and all persons in active concert or participation with them who receive actual notice of this Final Judgment by personal service or otherwise are permanently restrained and enjoined from violating Section 17(a) of the Securities Act of 1933 (the "Securities Act") [15 U.S.C. § 77q(a)] in the offer or sale of any security by the use of any means or instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly:

(a)     to employ any device, scheme, or artifice to defraud;

(b)     to obtain money or property by means of any untrue statement of a material fact or any omission of a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c)     to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser.

## III.

**IT IS FURTHER ORDERED, ADJUDGED, AND DECREED THAT:**

Defendant Anatoly Russ, and Defendant's agents, servants, employees, attorneys, and all persons in active concert or participation with them who receive actual notice of this Final Judgment by personal service or otherwise are permanently restrained and enjoined from violating, directly or indirectly, Section 10(b) of the Securities Exchange Act of 1934

("Exchange Act") [15 U.S.C. § 78j(b)], and Rule 10b-5, promulgated thereunder [17 C.F.R. § 240.10b-5] by using any means or instrumentality of interstate commerce, or of the mails, or of any facility of any national securities exchange in connection with the purchase or sale of any security:

      (a)    to employ any device, scheme or artifice to defraud;

      (b)    to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; or

      (c)    to engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person.

## IV.

**IT IS FURTHER ORDERED, ADJUDGED, AND DECREED THAT:**

Defendant Anatoly Russ is liable for disgorgement of $88,465, representing profits gained as a result of the conduct alleged in the Complaint, together with prejudgment interest thereon in the amount of $12,407.52, for a total of $100,872.52. The Commission may enforce the Court's judgment for disgorgement and prejudgment interest by moving for civil contempt (and/or through other collection procedures authorized by law) at any time after ten days following the entry of this Final Judgment. In response to any such civil contempt motion by the Commission, the Defendant may assert any legally permissible defense. Payments under this

paragraph shall be made to the Clerk of this Court, together with a cover letter identifying Russ

as the defendant in this action; setting forth the title and civil action number of this action and

the name of this Court; and specifying that payment is made pursuant to this Final Judgment.

Defendant shall simultaneously transmit photocopies of each such payment and the letter to the

Commission's counsel in this action.  By making this payment, Defendant relinquishes all legal

and equitable right, title, and interest in such funds, and no part of the funds shall be returned to

Defendant.  The Clerk shall deposit the funds into an interest bearing account with the Court

Registry Investment System ("CRIS") or any other type of interest bearing account that is

utilized by the Court.  These funds, along with other funds paid into the Court on behalf of Russ

by other parties holding his assets, together with any interest and income earned thereon

(collectively, the "Fund"), shall be held by the CRIS until further order of the Court.  In

accordance with 28 U.S.C. § 1914 and the guidelines set by the Director of the Administrative

Office of the United States Courts, the Clerk is directed, without further order of this Court, to

deduct from the income earned on the money in the Fund a fee equal to ten percent of the income

earned on the Fund.  Such fee shall not exceed that authorized by the Judicial Conference of the

United States.  The Commission may propose a plan to distribute the Fund subject to the Court's

approval.  Defendant shall pay post-judgment interest on any delinquent amounts pursuant to 28

U.S.C. § 1961.

**V.**

**IT IS FURTHER ORDERED, ADJUDGED, AND DECREED THAT:**

Should the Commission succeed in repatriating, or otherwise collecting, any of

Defendant's assets, such assets, in whatever form, need not be deposited in the Registry of this

Court but, rather, may be paid to the Securities and Exchange Commission and remitted

thereafter directly to the United States Treasury.  However, the Commission shall within ten

days of receipt of any such assets, notify this Court of its receipt of such assets by the filing of a

Notice of Receipt of Defendant's Assets, so that defendant may be properly credited for any such

payments against amounts owed as disgorgement.

**VI.**

**IT IS FURTHER ORDERED, ADJUDGED, AND DECREED THAT:**

Defendant Russ shall pay a civil penalty in the amount of $130,000 pursuant to

Section 20(d) of the Securities Act [15 U.S.C. § 77t(d), as amended by 17 C.F.R. § 201.1003]

and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3), as amended by 17 C.F.R.

§ 201.1003].  Russ shall make this payment within ten business days of the entry of this Final

Judgment by certified check, bank cashier's check, or United States postal money order payable

to the Securities and Exchange Commission.  The payment shall be delivered or mailed to the

Office of Financial Management, Securities and Exchange Commission, Operations Center,

6432 General Green Way, Mail Stop 0-3, Alexandria, Virginia 22312, and shall be accompanied

by a letter identifying Russ as the defendant in this action; setting forth the title and civil action

number of this action and the name of this Court; and specifying that payment is made pursuant

to this Final Judgment.  Russ shall simultaneously transmit photocopies of such payment and the accompanying letter to Scott Thompson, Senior Trial Counsel, Securities and Exchange Commission, Philadelphia Regional Office, 701 Market Street, Suite 2000, Philadelphia, PA 19106.  Russ shall pay post-judgment interest on any delinquent amounts pursuant to 28 U.S.C. § 1961.  The Commission shall remit the funds paid pursuant to this paragraph to the United States Treasury.

## VII.

**IT IS FURTHER ORDERED, ADJUDGED, AND DECREED THAT:**

This Court shall retain jurisdiction of this matter for the purposes of enforcing the terms of this Final Judgment.

_____                                _____
DATE                                                           Leonard B. Sand
                                                                    United States District Judge

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

———————————————————————————————

SECURITIES AND EXCHANGE COMMISSION,

                 Plaintiff,

                 v.

ANATOLY RUSS,

                 Defendant.

———————————————————————————————

Civ No. 08CV0415 (LBS)
ECF Case
**REDACTED**

## ORDER FREEZING ASSETS AND
## <u>DIRECTING PAYMENT TO THE COURT</u>

      Having GRANTED an Order of Final Judgment on Default and Order of Permanent

Injunction and Other Relief Against Defendant Anatoly Russ on _____, 2008 ("Final

Judgment"), and upon consideration of the Motion by Plaintiff Securities and Exchange

Commission (the "Commission") seeking an Order freezing Defendant Anatoly Russ' assets

currently held by Penson Financial Services, Inc. and TD Ameritrade, Inc. and directing that

those assets be paid into the Registry of the Court, together with the accompanying sworn

declarations;


      **NOW THEREFORE,**

## I.

      **IT IS HEREBY ORDERED, ADJUDGED, AND DECREED THAT:**

      Plaintiff Commission's motion is hereby GRANTED, and the assets of Anatoly Russ

held by Penson Financial Services, Inc. and TD Ameritrade, Inc. in the accounts listed below are

hereby frozen.

## II.

**IT IS HEREBY FURTHER ORDERED, ADJUDGED, AND DECREED THAT:**

Penson Financial Services, Inc., within ten business days of being served with this Order by facsimile or other reasonable means, shall transfer to the Registry of the Court the balance of account number [REDACTED]59 in the name of Anatoly Russ, all of which shall be applied toward the payment of disgorgement ordered against Defendant pursuant to the Final Judgment. Penson Financial Services, Inc. shall make the foregoing payment by cashier's check payable to the Clerk of the Court, and shall include with such payment a cover letter identifying Russ as defendant in this action; setting forth the title and civil action number of this action and the name of this Court; and specifying that payment is made pursuant to the Final Judgment of ____, 2008. Penson Financial Services, Inc. shall simultaneously transmit photocopies of such payment and letter to the Commission's counsel, Scott Thompson, Senior Trial Counsel, Securities and Exchange Commission, Philadelphia Regional Office, 701 Market Street, Suite 2000, Philadelphia, PA 19106, who shall attempt to send notice to Defendant.

## III.

**IT IS HEREBY FURTHER ORDERED, ADJUDGED, AND DECREED THAT:**

TD Ameritrade, Inc., within ten business days of being served with this Order by facsimile or other reasonable means, shall transfer to the Registry of the Court the balance of account number [REDACTED]39 in the name of Anatoly Russ, all of which shall be applied toward the payment of disgorgement ordered against Defendant pursuant to the Final Judgment.

2

TD Ameritrade, Inc. shall make the foregoing payment by cashier's check payable to the Clerk

of the Court, and shall include with such payment a cover letter identifying Russ as defendant in

this action; setting forth the title and civil action number of this action and the name of this

Court; and specifying that payment is made pursuant to the Final Judgment of ____, 2008.  TD

Ameritrade, Inc. shall simultaneously transmit photocopies of such payment and letter to the

Commission's counsel, Scott Thompson, Senior Trial Counsel, Securities and Exchange

Commission, Philadelphia Regional Office, 701 Market Street, Suite 2000, Philadelphia, PA

19106, who shall attempt to send notice to Defendant.


_____                    _____
DATE                               Leonard B. Sand
                                   United States District Judge

3